IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

HÉCTOR PABLO OLIVA; SALUD
NATURAL ENTREPRENEURS, INC.,

Plaintiffs

v.                                                           CIVIL 07-1569 (JAG)

MICHAEL POMA RAMÍREZ;
DISCOVERY HEALTH ESTILOS
CORP., et al.,

Defendants

MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION
GRANTING MOTION FOR PRELIMINARY INJUNCTION

        On June 26, 2007, Héctor Pablo Oliva and Natural Entrepreneurs, Inc., filed

a complaint against Michael Poma Ramírez and Discovery Health Estilos Corp.

alleging trademark infringement, false designation of origin, trademark dilution,

cybersquatting, unfair competition, trade libel, and tortious interference.  (See

Docket No. 1.)  At the same time, plaintiffs requested a preliminary injunction to

enjoin the defendants from unlawfully selling and distributing counterfeit dietary

supplements, that is NOPALINA-brand dietary supplements, in packages bearing

trademarks that are unauthorized copies and imitations of plaintiffs' trademarks

and which are practically identical to those of plaintiffs.

CIVIL 07-1569 (JAG)                    2

This court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), § 1338(b) (unfair competition, trademark law) and supplemental jurisdiction over the state law claim under 28 U.S.C. § 1367(a).

Plaintiffs' complaint states claims for trademark infringement under the Lanham Act § 43(A)(1)(A), false and misleading representations under the Lanham Act § 43(A)(1)(B), trademark dilution under the Lanham Act § 43(c), violation of the Anticybersquatting Consumer Protection Act, 15 U.S.C. § 1125(D)(1)(A), violation of the Puerto Rico Trademark Act, violation of concepts of unfair competition, trade libel, and tortious interference with contractual relations.

At the evidentiary hearing held on July 16, 2007, Dr. Héctor Pablo Oliva, a medical doctor educated in Argentina, testified that his company SALUD NATURAL ENTREPRENEURS manufactures and distributes natural products. The company, founded in 1997, is located in Chicago, Illinois. He is the president of and owns Salud Natural Entrepreneurs. The company manufactures and distributes natural products in different forms such as capsules, juices, teas, formulas, and fibers, including flaxseed from Canada, and also including NOPALINA Linaza Plus, under trademark, and the packaging of which includes the figure of a little girl, which is the mark of the product. In conjunction with an independent contractor, an engineer, Dr. Oliva invented the character of the little girl, and the package. The

CIVIL 07-1569 (JAG)                    3

mark for NOPALINA Linaza Plus was created in January, 2004.  The independent contractor with whom Dr. Oliva worked recently transferred all of the rights to the mark.  (See Exhibit 2, copyright assignment signed by Mr. Eric Hernan.)

Dr. Oliva created the formula for NOPALINA Linaza Plus, which contains flaxseed from Canada among its ingredients, and is then manufactured in the Chicago plant located at 3311 W. Carroll Avenue, Chicago, Illinois 60624.  The product is packaged and sold through distributors.  Dr. Oliva has been involved in manufacturing since 1997, and in the production of NOPALINA since 2004 when he created the mark.  Aside from the Chicago factory, there is no other factory producing NOPALINA.  The ingredients include flaxseed from Canada, which has more Omega-3, -6, and -9, as well as wheat bran, and oat bran which are purchased in the United States, senna leaf powder from India, nopal (cactus) from Mexico, and orange, pineapple, apple fruit flavors from California, purchased from a company called Gold Coast.  (See Exhibits 3 and 4b.)  Other suppliers which shipped ingredients to the Chicago plant of Salud Natural are Bianchi Milling, Inc. and Internacional de Alimentos, from Mexico.  (See Exhibit 4c.)  Exhibit 5b is an invoice for the ingredient senna leaves powder from India.  Another exhibit, 5c, reflects purchases from San Francisco Herb & Natural Food Co. for psyllium musk. Exhibit 5d is an invoice from LaCrosse Milling Company, for oat bran sacks.

CIVIL 07-1569 (JAG)                    4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

All ingredients of NOPALINA are processed at the plant.  The pouch bags used for packaging the product are produced in India.  Prairie State Group in Illinois started printing the first labels for the pouch bags in 2004.  Plaintiffs would buy the bags and stick the NOPALINA Linaza Plus labels to the bags.  (See Exhibit 6.)

The UPC bar code from 2004 belongs to Salud Natural.  His own signature reflects his approval for the printing of the label.  Eric Hernan designed the label and Prairie State Group printed it but Dr. Oliva approved the proof.

Mr. Hernan is now working with another company.  The packaging has changed.  Now it has a zip-lock for benefit of the customer.  Polymethalized bags are shipped by U-line.  (See Exhibit 8.)  A flyer with a sticker that says NOPALINA Linaza Plus, was created in 2004.  (See Exhibit 9.)  Exhibit 10 is a package, with the little girl and the TM and all the ingredients, and the UPC Code.  He described the bag, identifying the phone number and name of the company.  (Blow ups of the bag for illustrative purposes are Exhibits 11 and 12.)  Dr. Oliva testified that this is genuine NOPALINA because of the art, UPC, the little girl, the color, the telephone number, and the contents on the back, flaxseed plus, explained in Spanish and English, and the uses people have for it.  This is the design that he recognizes.  The source of the bags is Parikh Packaging who manufactures the

CIVIL 07-1569 (JAG)                    5

pouch in India.  (See Exhibit 6.)  Parikh Packaging sent to him a proof which shows the sizing of the pouch, the job number, and weight.

NOPALINA has different distributors in different states.  Salud Natural sells to distributors who sell to stores wholesale and the stores then retail.  In relation to the UPC code, he owns it since 2004, when he placed it on the first labels. (See Exhibit 12.)  GS1 owns all the UPCs and NOPALINA bought the UPCs from GS1.  The stores work with it and identify the product.  (See Exhibit 12, invoice from GS1, located in Dayton, Ohio, to Héctor P. Oliva, dated June 1, 2006.)  The company GS1 assigns a different number of UPCs to Salud Natural and they identify different products to differentiate the products, such as capsules and powders.  Each product has a different UPC to avoid confusion in the stores.

Dr. Oliva explained his promotion of NOPALINA.  Advertising and promotional efforts for NOPALINA in 2004 involved radio, TV, newspapers, reflecting information to people about the product in the English language, in Chicago, Illinois, in particular.  In Puerto Rico,  Radio Isla, Primera Hora, Nuevo Día, Vida Sana, SBS (Spanish Broadcasting System in NYC), Telemundo, Televicentro, were used in 2004.  (See Exhibit 13, which shows invoices he has received from different sources, like Radio WADO in 2005.  It costs, e.g., $3,000 a week, Radio Amor costs $6,000 a week.)  Dr. Oliva would have the idea and the radio station helped to produce the radio spot.  Sometimes Dr. Oliva is featured

CIVIL 07-1569 (JAG)                 6

in the spot.  Sometimes, Dr. Oliva is charged in a package deal.  Once Univision charged $3,000 to produce the spot.  In radio, in 2004, they spent $50,000.  In 2005, they spent $400,000 or 500,000.  In 2006, they spent $2 or 3 million.  They have spent a total of about more than $7,000,000 in the total investment for advertising.

Salud Natural started distributing in Puerto Rico in 2004, and continuously since then.  Dr. Oliva appears in some of the ads on TV.  On Televicentro or Telemundo they would spend $10,000 a week each.  NOPALINA explains what it is good for and it identifies the official source.  They identify the product and show how to identify the product because they have problems with counterfeiting.  Salud Natural explains what a diet supplement is good for.  It is a successful product and people continue asking for the product.  They have generated sales in NOPALINA since 2004 in the gross amount of $50,000,000 to $60,000,000, that is, the wholesale price to the distributors.

Salud Natural also uses the internet.  The domain on the internet is www. Nopalinausa.com.  (See Exhibit 14.)  The exhibits reflect the advertising plaintiffs use on their web page.  Dr. Oliva appears in a family picture on the internet.  People can access the domain or website which was registered on October 21, 2005.  (See Exhibit 14-B, which reflects Dr. Oliva's home address.)  The contents of the website were designed by different people, including a distributor in Mexico

CIVIL 07-1569 (JAG)                     7

and Mr. Hernan.  The content of the webpage has changed to reflect, for example, all the places where NOPALINA sells, including places in Honduras, Ecuador, Spain, and Colombia.

The manner in which the product is sold is through distributors for entire states or for an entire country.  (See Exhibit 15, pages reflecting a sampling of sales invoices and purchase orders.)  Exhibit 16 reflects numerous sales to JR Natural and Mr. Juan Rincón in Bayamón.  This is the exclusive distributor in Puerto Rico of NOPALINA Linaza Plus.

Dr. Oliva testified that he is aware of other people using the mark.  There was such a problem with GNC.  Juan Rincón called him in 2006 and mentioned that there was a problem with a product, since he got confused.  Dr. Oliva saw the same colors, pouch and character.  Salud Natural had never sold a product with Made in China on it.  A test of the product showed that the product was totally different.  Referring to Exhibit 17, the counterfeit product, he said that everything in the product was copied, including the phone number and UPC number.  The only difference was that the counterfeit product shows MADE IN CHINA.  Salud Natural would not send flaxseed to China.  That would make no sense.  An injunction was then sought against the offender.  Michael Poma Ramírez in 2006 called Dr. Oliva's son in Chicago and said he represented GNC Caribbean.  Exhibit 18 is a document Dr. Oliva received from him on August 25, 2006.

CIVIL 07-1569 (JAG)                    8

Dr. Oliva thought they were dealing with a representative from GNC in Puerto Rico.  Salud Natural sold the product to  Poma representing GNC, in the amount of 20,000 bags and Poma paid $10,000, but did not pay for the rest of the order.

Poma made another offer to buy more NOPALINA, which offer was rejected. Dr. Oliva then learned that GNC was not represented by Poma.  Referring to Exhibit 19, it shows the e-mail address of Poma at GNC; first page of Exhibit 19, first paragraph from GNC.net which was Mr. Poma's account.  The heading says from GNC.  Exhibit 20 is from Gilberto (regional sales director), dated January 24, 2007 and it says that GNC only buys products from Poma who is just another vendor, that there is no partnership with Poma.

Mr. Rincón sought an injunction in local court and GNC stopped selling counterfeit NOPALINA Made in China.  Dr. Oliva would not have sold to Poma if he knew he was not associated to GNC.

Dr. Oliva spoke to Gilbert Radcliffe, the sales manager of GNC in Puerto Rico.  He told Dr. Oliva he had no relation with  Poma.   Gilbert thought it was the same product.

Once the Made in China product was distributed in Puerto Rico, Juan Rincón started going to court to deal with the problem.  Dr. Oliva used the radio to instruct the public about the counterfeited product, down to the little doll.  (See

CIVIL 07-1569 (JAG)                                9

Exhibits 21 and 22.)  When the problem arose, plaintiffs went to the newspaper and advertised that the product Made in China does not belong to plaintiffs.  Then Poma advertised that the legal NOPALINA comes from China.  The ad mentions the manufacturer in China.  The ad shows the graphic (see Exhibit 21) and the added change of dietary supplement and uses the word exactly as the non-counterfeited product as well as the little doll.  This was not authorized by the plaintiffs.

Dr. Oliva testified that the counterfeiting action is injuring his company as well as the people of Puerto Rico because the people identify NOPALINA and associate it with  the counterfeited NOPALINA.  He concluded that this had to be done deliberately to confuse consumers, that it was dishonest, and that it was done for money.  If people knew that the counterfeit NOPALINA is not the genuine NOPALINA from 2004, it would fool them.  A concern regarding the counterfeit product is that it is not a drug but a dietary supplement.  The contents of the counterfeit product package is totally different and the content smells totally different from the genuine NOPALINA.  The mix is totally different.  The counterfeit product was sent to a neutral laboratory to see the content of the proteins and fatty acids.

A DVD was played during the hearing showing ads played in Puerto Rico about NOPALINA Linaza Plus in which Dr. Pablo Oliva appears.  (See Exhibit 23.)

CIVIL 07-1569 (JAG)                    10

These spots cost about $10,000 a week at Telemundo or Televicentro.  One of those ads was produced by the advertising agency.  When asked to estimate the damages he was receiving as a result of the sales of the counterfeit product on a day to day basis, Dr. Oliva noted that one order went down from 100,000 to 20,000 bags.  He noted that defendant Poma changed the new bag.  (See Exhibit 24.)  Defendant Poma copied all of the words.  He changed the wording of dietary supplement and the location of the TM on the face of the package.  He also changed the UPC bar code.  The NOPALINA bag is different and has different lettering although Mr. Poma still copied the mark, colors, letters, ingredients, phone number and parts of the contents.  Dr. Oliva felt that this has caused irreparable injury damaging his company since this is a new, totally different NOPALINA which comes from China, and Mr. Poma copies plaintiffs' mark, counterfeits their product and confuses the retailers and customers.  Mr. Poma has told people that the one made in China was the good one.  This occurred on Radio Isla.  Responding to the allegations of Mr. Poma, Dr. Oliva spent $2,300 at El Nuevo Día.  He has spent more than $10,000 on these issues.

Dr. Oliva explained how he makes NOPALINA Linaza Plus.  He mixes fibers together, and explains that it is a dietary supplement, not a drug.  Dr. Oliva asked engineers in Mexico to help in the design.  The most important thing in this product is fiber.  The doctor gets information on wheat bran, oat bran, and

CIVIL 07-1569 (JAG)                    11

flaxseed from Canada by personal research.  There is a formula and it can be a mixture.  (See Exhibit 10.)  He manufactured this product, and knows the exact contents of the product.  This is  not a unique product.  There are other products that can do the same work, but are not exactly the same product.  There are similar products to this one.  Dr. Oliva does not own a patent for this product.

Dr. Oliva is familiar with the United States Patent and Trademark Office (USPTO) and has gone there to try to register his trademark.  He did not make a search for a similar trademark.

Dr. Oliva has conducted business in Puerto Rico since 2004 but applied to do business in Puerto Rico two days ago.  Of the $50,000,000 grossed, he has made $1.5 million in Puerto Rico.  His product complies with the FDA rules but the FDA does not approve dietary supplements, only drugs.

DACO issued an order to Juan Rincón to stop selling the product in Puerto Rico.  Dr. Oliva filed a trademark application and was told that there was a NOPALINA Linaza Plus application and that if that was accepted it would cause problems with his application.  Exhibit B is the supplemental registration of NOPALINA.

When the USPTO informed Dr. Oliva of NOPALINA, Dr. Oliva responded.  The latest trademark application with the USPTO is dated June 2007.  (See Exhibit C.) It mentions that the first date of use was as  early as January 2, 2004.  In the

CIVIL 07-1569 (JAG)                    12

previous application, he stated that he used the trademark since as early as January 1, 2003. Dr. Oliva explained that the character of the little girl was incorporated in 2006 to make the product more recognizable. The colors have no particular reason behind them.

Dr. Oliva has not conducted any business with Prime Pharm in China and has not imported products from them. Although Dr. Oliva told a local court that he had a registration, he does not have a registration for NOPALINA Linaza Plus. Since August 2006 Dr. Oliva became aware of the counterfeiting product and that Poma had an application with the Puerto Rico Trademark Office for NOPALINA.

DACO issued a temporary restraining order against Juan Rincón because NOPALINA Linaza Plus contains sacred bark. If the package contains sacred bark, it has to have a sticker. (See Exhibit 25.) NOPALINA Linaza Plus' most recent version reflects the elimination of sacred bark in order to eliminate the problem. Sacred bark is no longer reflected in the ingredients. Exhibit 7 reflects the colors used in the packaging; this is the same color scheme used since the beginning of the distribution.

Gilbert Radcliffe testified that he works at GNC Puerto Rico, Inc., a vitamin retailer which sells supplements. He has worked there since December, 2005 and is the regional sales director of GNC Puerto Rico. He is responsible for sales and merchandising. Referring to Exhibit 18, he noted that the GNC logo appears in

CIVIL 07-1569 (JAG)                    13

the same.  The document however was not generated by GNC since the logo is not centered and does not look a GNC  document at all.  It looks like a purchasing order.  Mr. Radcliffe has never seen the document, that is, Exhibit 18, and GNC does not receive products at the address listed.  Referring to page 2 of the exhibit, he stated that it was not issued by GNC since it is not the GNC format. The correct logo is centralized, not to the left as in Exhibit 18.  He also noted that Michael Poma is not an authorized representative of GMC and has never been one.  In August 2006, GNC began purchasing NOPALINA from him.  From 300 to 500 boxes of NOPALINA were purchased.  Michael Poma said he obtained the goods from Salud Natural and was a representative of Salud Natural.  The people at GNC believed him.  GNC paid Poma for the purchase of the product so that nothing is outstanding.  A further purchase was made in December 2006.  That was the last purchase from Michael Poma.

Referring to Exhibit 19, Mr. Radcliffe testified that the domain GNCPR.net has not been authorized to be used by GNCPR as a domain.  Looking at the top of the document, the from part, he noted that the same did not reflect an authorized GNC address.   And looking at page 3, bottom, Mr. Radcliffe testified that GNC does not have an employee in accounts payable named Didi.

GNC decided not to buy NOPALINA because of the conflict between two companies over the product, one that said Made in USA and another one Made in

*1*

*2*

CIVIL 07-1569 (JAG)                    14

*3*

*4*

CHINA.  GNC was enjoined by a court from selling the one made in China.  (See

*5*

Exhibit 20.)  Mr. Radcliffe saw Poma in early 2006 and saw him five or six times.

*6*

He tried to sell other products.  He identified a picture of Mr. Poma in court.  (See

*7*

Exhibit 26.)

*8*

*9*

        Juan B. Rincón, testified that he wholesales natural products through a

*10*

corporation.  He sells products geared to special health conditions as JR Natural

*11*

& Distributors, Inc., and has sold under JR Natural since 2000.  Specific brands

*12*

that he distributes are, e.g., Lifeflow with Progensa 50.  This has been in the

*13*

market for five years and is well known in the field of natural health.   Until

*14*

December 2006, another line that he sold, had collagen and some other products

*15*

for different conditions.  He has represented the Salud Natural line since 2004.

*16*

It is owned by Dr. Oliva.  The product is a combination of herbs and herbal

*17*

combinations and he began to market it in 2004.  Since mid 2004, a principal

*18*

*19*

product he wholesaled was NOPALINA Linaza Plus which he would buy from Salud

*20*

Natural Entrepreneurs.   On July 20 2004, he made his first purchase of

*21*

NOPALINA.  There were subsequent purchases.

*22*

*23*

        After this Mr. Rincón continued purchasing from Salud Natural and continued

*24*

to buy NOPALINA Linaza Plus because he had been at the warehouse and factory

*25*

in Chicago in August of 2006.  He saw the ingredients at the warehouse as well

*26*

*27*

as where the boxes are prepared and where the packaged product is placed.  As

*28*

CIVIL 07-1569 (JAG)                    15

local distributor of NOPALINA Linaza Plus, Mr. Rincón's company has the professional commitment and responsibility for selling certain amounts of different products in Puerto Rico.  They sell to more than 120 different natural product stores in Puerto Rico such as Fresh Mart since September 2004.  (See Exhibit 27, copies of invoices of his company to Fresh Mart, all dated 2004.)  Fresh Mart has four stores and invoices go to each separately.  (See Exhibits 27a, 27b, 27c and 28.)

No other retailer is reflected in these invoices.  Econatura at the Bayamón Shopping Center started selling NOPALINA Products in 2004.  (See Exhibit 29.) Juan Rincón also sold NOPALINA to Super Energy Health Food Stores in Bayamón in Riverside.  (See Exhibit 30.)  They also sell through a subdistributor with Mr. Jorge Espada for sales to drug stores.  He is responsible for selling NOPALINA and Juan Rincón pledges to maintain sufficient amounts of it in stock.  Mr. Rincón looked at Exhibit 31 (bag of NOPALINA Linaza Plus) noting that it says Made in China.  The retailer reflected there is GNC.  He learned about this because his spouse was visiting the Plaza del Sol store of GNC.  She thought it was curious because GNC was not Juan Rincón's client.  Mr. Rincón had never seen a bag with Made in China on it.  Mr. Rincón called Dr. Héctor Pablo Oliva and confronted him with the existence of this product and Dr. Oliva told him that the product was not from Salud Natural.  Juan Rincón consulted with his attorneys to see alternatives

CIVIL 07-1569 (JAG)                    16

of action.  The doctor said it was strange because it appeared to be the same product including SNE as well as their telephone number and bar code.  The contents were examined and its smell was different, like oily and the smell would draw you away, like Purina feed for chickens.  The appearance of the mixture was a little bit darker.  When one would make the mix, the product clumps which does not happen with NOPALINA. He tasted it.  There was no difference because of the neutral taste but one would throw up.  Clients complained that it would not mix as well, that it would form a hard paste, and was impossible to taste.  He was concerned because a person could go to the GNC store and think he is buying a genuine product and he is not, so the person would associate the result with what they tried before from the real product.  There was no guarantee of what was inside the Made in China bag.  He conducted an experiment of two days of letting the product sit, and the China NOPALINA developed maggots.  With the genuine NOPALINA, the smell remained the same and no maggots developed in it.

JR asked GNC in writing to stop selling the fake product, that is, NOPALINA Made in China.  GNC did not stop selling the product so an injunction was requested at the Superior Court of San Juan to compel GNC stores to stop selling the product.  JR attempted to serve summons on Michael Poma Ramírez but it was impossible to serve him with summons.  The case proceeded against GNC only. Poma was not named as a defendant.  A preliminary injunction issued so that GNC

CIVIL 07-1569 (JAG)                    17

would not sell those products.  GNC stopped selling the product, and informed that they were interested in selling the genuine product.

Mr. Rincón again stumbled upon Made in China NOPALINA in May 2007 through a sub-distributor Jorge Espada.  They called Dr. Oliva and told him that the NOPALINA Made in China had surfaced in some of Mr. Rincón's stores and drugstores where Mr. Espada distributes.  There was a different type of problem since other stores were selling and someone else was claiming that Salud Natural was not the manufacturer of the NOPALINA product, an allegation which came in a letter from a laboratory in China.  Mr. Rincón asked Dr. Oliva, as owner of the brand, to support JR and protect its market and file a claim over the title of his brand.   Dr. Oliva went to the press and published an article about the fake NOPALINA Made in China and that it was a forgery.  (See Exhibit 32, copy of the first announcement (ad) denouncing the fake NOPALINA Made in China by Dr. Oliva on behalf of Salud Natural.)  There is a web page in the ad.  Two days later, an ad appeared in Primera Hora claiming that the true, legal  NOPALINA is the one Made in China, in response to Dr. Oliva's article.  JR received information from the newspaper that Michael Poma Ramírez paid for the ad.  (See Exhibit 22.)  A photocopy of the ad mentions PrimFarma Co. and D Health Co.  The telephone contact appears for people interested in the product, and e-mail addresses including li@nopalinapr.com.  They informed Dr. Oliva that a second advertising

CIVIL 07-1569 (JAG)                    18

regarding powder form and capsules of NOPALINA were available.  They are currently being distributed.  Comparing Exhibits 24 and 31, Mr. Rincón noted one difference, one has Made in China, the one at GNC, the Made in China being the only difference.  Exhibit 24 has added to the products such as dietary supplement, and warning about sacred bark in English and Spanish, and on the back a large supplemental facts table, which was not on the other fake bag from the GNC stores.  There is an FDA registration number, distributed in Puerto Rico and USA by D Health and Corp. D. Health is owned by Mr. Poma Ramírez.  An attempt was made to register the trademark and D Health made the attempt.  Exhibit 24 bears the marks of Salud Natural, the name and cartoon girl. There are different elements from the original bag.  There is also a stripe  at the bottom with a symbol of Canada and pictures of fruit ingredients.

Some health stores are selling these products.  JR sales have been affected. Clients have preferred to buy the China product, about 1/4 of the clients, because it is cheaper and the retailers are given better sales terms and because they receive written information that says that this product is the legal one.

In response to Mr. Poma's registration at the Puerto Rico State Department, JR filed a motion in opposition because Salud Natural is the owner of the brand, as shown by evidence dating to 2004 of the use of the mark.  (See Exhibit 33.)  The Department of State issued a trademark registration certificate in spite of

CIVIL 07-1569 (JAG)                    19

this.  It said that Poma could continue to use the mark.  An injunction was received in Mr. Rincón's office ordering that they discard all products of NOPALINA Linaza Plus because of unfair competition as to Mr. Poma.  They were not notified but they learned about it when the process server came to the office and took 51 boxes, each containing 50 pouches of NOPALINA Linaza Plus, and they were summoned to appear before Superior Court Judge Oscar Dávila Suliveres.  At the hearing, the judge understood that the seizure was not in order and ordered the return of the seized goods, ordering that the case be transferred to the United States District Court.

A contract of exclusivity was signed on January 1, 2005 and Mr. Rincón was the first person to bring the product to the market, with two boxes of 50 bags each, a total of 100 bags.  He then began distributing the product.  Dr. Oliva sent him the product and they examined the quality of the product, confiding in the word of Dr. Oliva as to the ingredients.  Mr. Rincón requested to register the product in the Dominican Republic.  In certain markets, government authorization is required.  He visited the facilities where NOPALINA Linaza Plus is produced one day and saw the employees producing the product.  He does not know the ratio of the ingredients of NOPALINA Linaza Plus.  When one ran tests comparing the Made in China and Made in USA products, academic background was immaterial. Mr. Rincón noted that there are products with Linaza Nopal in the market so there

CIVIL 07-1569 (JAG)                    20

is competition with these products.  He learned in January 2007 that the product imported by Michael Poma, NOPALINA Linaza Plus, made in China was being sold in GNC stores.  At one time, someone attempted to sell a product with a stamp on it that said NOPALINA Linaza Plus.  That was detected in three health food stores in Puerto Rico, Descubra Health Foods in Bayamón, Dora's Health Food in Arecibo and Viva Más Health Food in San Patricio Plaza.  He told Dr. Oliva about the situation and filed a complaint in August 2006 against Celia Batista regarding a product in capsules that they called NOPALINA Linaza Plus, and they were challenged.  Other parties have tried to use the name in the past.  Regarding the complaint against GNC filed in January 2007, at that time, he knew Michael Poma was in charge of selling that product, although he was not included in the lawsuit. DACO issued a restraining order against NOPALINA Linaza Plus which Mr. Rincón sells.

     In a sworn statement of Mr. Rincón, he notes that the FDA issued a certificate in favor of SNE Salud Natural Incorporated.  (See Exhibit 33, at 2.) This is not true.  He may have not paid close attention to the content.  Paragraph 4, at page two, says that SNE Inc. has a presentation for inscription before the USPTO serial 95245 which protects the name product and its formula.  However, NOPALINA is not protected by the USPTO.  Nor is the formula protected.  So that statement is not true.

CIVIL 07-1569 (JAG)                    21

On re-direct examination, Mr. Rincón stressed certain parts of the sworn statements that were correct.

DACO issued an injunction to cease and desist sale of NOPALINA Linaza Plus until a hearing in order to comply with the requirement of the listing of the sacred bark on a separate external stamp with a warning about the sacred bark.  The injunction was set aside.

Evelyn Rodríguez Rosado, store owner of Super Energy Health Foods in Bayamón, sells vitamins and natural products.  She has owned the store for 27 years.  She testified that Mr. Juan Rincón started selling NOPALINA to Super Energy Health Foods in November 2004 and referred to Exhibit 30, invoices received from Juan Rincón when he sells her a product.  She buys six boxes of 50 a month, and started with six bags.  There was amazing feedback and customers liked it and they saw it on TV.  She herself uses the product and finds it very good.  Ms. Rodríguez is a pharmacist and both her and her husband are naturopaths, licensed in Puerto Rico.

Ms. Rodríguez is also familiar with another product which is made in China, presented to her by Mr. Michael Poma, who had ordered it.  Mr. Poma first contacted her in November 2006.  He was making NOPALINA and bringing in a full container.  He compared it and said it was cheaper, $6.00.  She was buying the other one for $7 and something.  "They" were making it for him (Mr. Poma) and

CIVIL 07-1569 (JAG)                    22

he was going to sell it cheaper.  She never saw him again and did not buy it from him.  She bought NOPALINA from a vendor of Poma who was sitting in the courtroom.  The vendor said that this was the real NOPALINA.  She bought 40 or 50 bags and sold them to a pharmacy.  The bags are identical to the ones distributed by Juan Rincón.  She never sold any other product from Poma.  She told Tony, another vendor, that this product was another product, not the real product.  She told him that over the phone.  In late 2006, she saw Mr. Poma face to face, and identified his picture in court.  (See Exhibit 35.)

Rafael Escobar is a Deputy United States Marshal, San Juan, Puerto Rico, and is attached to a Fugitive Task Force.  He testified as to an outstanding warrant of arrest from the State of Florida related to Mr. Poma.  (See Exhibit 36, proffered i.d. F, G.)

Mari Annette Ferreira López works at Mother Earth on the third  level at Plaza Las Americas.  She sells natural products and has a restaurant.  She is familiar with NOPALINA Linaza Plus because she started selling it.  There was a very strong demand from the clients.  The product has continued to sell because the clients like it a lot.  She bought the product from JR Distributors.

Josefina Ramos Villalobos testified that she works for Fresh Mart es para Todos, and is director of operations since 1999.  JR Natural's Juan Rincón called them to inform about a new product, NOPALINA Linaza Plus, in early September

CIVIL 07-1569 (JAG)                    23

2004.  He presented her with the product.  She analyzed the ingredients looking at guidebooks in herbology.  This was a new product with a very interesting formula.  She tried the product in a small amount.  A new product is used by selling three to six items per store.  They were able to resell the product, as it was a very popular product.  (See Exhibits 27a, 27b, 27c and 28.)

Ana Ivelisse Torres testified that she owns Econatural, a health food store in Bayamón, Puerto Rico.  She has worked with NOPALINA since October 15, 2004.  She made purchases from JR Natural at that time and she still purchases from JR Natural.  She is familiar with its advertising on TV and radio, and is a type of broker for Radio Isla and Telemundo.  She was hired by Juan Rincón and Dr. Pablo Oliva.  Their investment was about $50,000 a month.  With Radio Isla, it was $20,000 and in April 2006 they invested about $50,000 per month.  There were very good results for the advertisements.  They had bought 400 boxes from JR Natural and after the Telemundo advertising, the sales increased 100%.

The defendants presented no witnesses at the hearing.  Argument was then heard on behalf of all parties.

PRELIMINARY INJUNCTION

The First Circuit uses a quadripartite test for determining whether litigants are entitled to preliminary injunction redress.  Under this framework, trial courts must consider (1) the likelihood of plaintiff's success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of

CIVIL 07-1569 (JAG)                    24

relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect the court's ruling will have on the public interest. <u>See Ross-Simmons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d 12, 15 (1st Cir. 1996) (citing <u>Weaver v. Henderson</u>, 984 F.2d 11, 12 n.3 (1st Cir. 1993); <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d 4, 5 (1st Cir. 1991)); <u>see also</u> <u>Ocean Spray Cranberries, Inc. v. PepsiCo, Inc.</u>, 160 F.3d 58, 60-61 (1st Cir. 1998); <u>DeNovellis v. Shalala</u>, 135 F.3d 58, 62 (1st Cir. 1998); <u>Starlight Sugar, Inc. v. Soto</u>, 114 F.3d 330, 331 (1st Cir. 1997); <u>Planned Parenthood League of Mass. v. Bellotti</u>, 641 F.2d 1006, 1008-09 (1st Cir. 1981); <u>Telerep Caribe Inc. v. Zambrano</u>, 146 F. Supp. 2d 134, 137 (D.P.R. 2001).

A.  Likelihood of Plaintiff's Success on the Theories of
Trademark Infringement and Unfair Competition.

At the stage of preliminary injunction, a trial court need not predict the eventual outcome of the case with absolute assurance, but rather make a statement as to the probable outcome of the case.  <u>See Ross-Simmons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d at 16; <u>Narragansett Indian Tribe v. Guilbert</u>, 934 F.2d at 6; <u>Telerep Caribe Inc. v. Zambrano</u>, 146 F. Supp. 2d at 137. With this standard in mind, I consider plaintiffs' claims in terms of probable success on the merits.

1.  Trademark/Trade Dress

CIVIL 07-1569 (JAG)                    25

This is in part a trademark infringement and unfair competition action under

Section 32 of the Lanham Act, 15 U.S.C. §§ 1114, 1125(a)(1).[1] "The purpose of

trademark laws is to prevent the use of the same or similar marks in a way that

_____

[1]        The trademark infringement provision is section 1114 and provides in pertinent part:

(1) Any person who shall, without the consent of the registrant—
     (a) use in commerce any . . . colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services . . . which such is likely to cause confusion, or to cause mistake, or to deceive;
. . .
shall be liable in a civil action by the registrant for the remedies hereinafter provided.

Title 15 U.S.C. § 1114(1)(a).

The unfair competition provision is Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1) and provides in relevant part:

(1) Civil action
     (1) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
          (A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, . . .
. . .
shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

Title 15 U.S.C. § 1125(a)(1)(A).

CIVIL 07-1569 (JAG)                    26

confuses the public about the actual source of the goods or services." I.P. Lund

Trading ApS v. Kohler Co., 163 F.3d 27, 36 (1st Cir. 1998) (citing Star Fin. Servs.,

Inc. v. Aastar Mortgage Corp., 89 F.3d 5, 9 (1st Cir. 1996)); Telerep Caribe Inc.

v. Zambrano, 146 F. Supp. 2d at 137-38 .   The rights to a trademark[2] are

acquired by use and not by registration; however, registration is *prima facie*

evidence of the validity of and the rights to such registered mark.  Telerep Caribe

Inc. v. Zambrano, 146 F. Supp. 2d at 138 (citing Veryfine Prods., Inc. v. Colón

Bros., Inc., 799 F. Supp. 240, 250 (D.P.R. 1992)).

        The breadth of the confusion-producing elements actionable under section

15 U.S.C. § 1125(a) has been held to embrace not just word marks and symbol

marks, but also "trade dress," a category which includes, not only the packaging

or "dressing" of a product, but also the product's design.  See Wal-Mart Stores,

_____

[2]      The term "trademark" includes any word, word, name,
        symbol, or device, or any combination thereof—

        (1) used by a person, or
        (2) which a person has a bona fide intention to use in
        commerce and applies to register on the principal register
        established by this chapter,

to identify and distinguish the services of one person, including a
unique service, from the services of others and to indicate the source
of the services, even if that source is unknown.  Titles, character
names, and other distinctive features of radio or television programs
may be registered as service marks notwithstanding that they, or the
programs, may advertise the goods of the sponsor.

Title 15 U.S.C. § 1127.

CIVIL 07-1569 (JAG)                    27

Inc. v. Samara Bros., Inc., 529 U.S. 205, 209 (2000).  Trade dress "has been defined as 'the design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer.'"  Chrysler Corp. v. Silva, 118 F.3d 56, 58 (1st Cir. 1997) (citations omitted).  In short, Section 43(a) of the Lanham Act, gives a person a claim for the use by any other person of any word, term, name, symbol, device, or any combination thereof which is likely to cause confusion among the consumers as to the origin, sponsorship, or approval of the goods.  15 U.S.C. § 1125(a)(1)(A).

Plaintiffs' mark is also a trade dress.[3]  To be protected under the Lanham Act, a trademark or trade dress must not be functional.[4]  I.P. Lund Trading ApS v. Kohler Co., 163 F.3d at 36 (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763, 775 (1992)).  Plaintiff must prove that its design has acquired a secondary meaning[5] or that it is inherently distinctive,[6] and that there is a

---

[3]      Trade dress includes the "design and appearance of [a] product together with the elements making up the overall image that serves to identify the product presented to the consumer." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d at 35 (citing Chrysler Corp. v. Silva, 118 F.3d at 58 (quoting Fun-Damental Too, Ltd. v. Gemmy Indus. Corp., 111 F.3d 993, 999 (2nd Cir. 1997)).

[4]      A functional product feature is one that "is essential to the use or purpose of the article or [that] . . . affects the cost or quality of the article." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d at 37 (quoting Inwood Lab., Inc. v. Ives Lab., Inc., 456 U.S. 844, 851 n.10 (1982)).

[5]      Descriptive marks receive protection only if secondary meaning is shown.  I.P. Lund Trading ApS v. Kohler Co., 163 F.3d at 39.  "To establish secondary meaning, a manufacture must show that, in the minds of the public,

CIVIL 07-1569 (JAG)                    28

likelihood that prospective purchasers will be confused as to the source of the product.  TEC Eng'g Corp. v. Budget Molders Supply, Inc., 82 F.3d 542, 545 (1st Cir. 1996) (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. at 769).

The degree of protection afforded under the Lanham Act is largely determined by the distinctiveness of the trade dress.  Id. at 1136.  Distinctiveness has been held to be an "explicit prerequisite for registration of trade dress under § 2 and 'the general principles qualifying a mark for registration under § 2 of the Lanham Act are for the most part applicable in determining whether an unregistered mark is entitled to protection under § 43(a).'"  Wal-Mart Stores, Inc. v. Samara Bros., Inc., 529 U.S. at 210 (citing Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. at 768).  Arbitrary and fanciful marks are not required in order to show secondary meaning.  Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. at 768.

the primary significance of a product feature or term is to identify the source of the product rather than the product itself." Id. at 41-42.

[6]     A design is "inherently distinctive" if it is fanciful or arbitrary.  "A 'fanciful' mark is a word or symbol 'which is coined for the express purpose of functioning as a trademark . . . [or] any obscure or archaic term not familiar to buyers.'"  Wiley v. Am. Greetings Corp., 762 F.2d 139, 141 n.1 (1st Cir. 1985) (citing J. McCarthy, Trademarks and Unfair Competition § 11:2, at 346 (1973) (now 2 J. McCarthy, McCarthy on Trademarks and Unfair Competition (4th ed. 1996)).  "'Arbitrary' marks are 'words, symbols, pictures, etc., which are in common linguistic use but which, when used with the goods or services in issue, neither suggest nor describe any ingredient, quality or characteristic of those goods or services.'"  Id. at 141 n.2 (citing McCarthy, § 11:4, at 350 (footnote omitted.))

CIVIL 07-1569 (JAG)                    29

A descriptive mark,[7] on the other hand, needs to prove secondary meaning to be protected under the Lanham Act.  See Wiley v. Am. Greetings Corp., 762 F.2d at 140.

In this case, the distinctive packaging and the little girl are their trade dress. Hence, I must analyze if the "overall image" of the packaging including the girl, is or is not "functional" and if the defendants' use is likely to cause confusion with the product for which protection is sought.  I find that they are not functional and that their use by the defendants is likely to cause confusion.

(a)  Functionality

The "overall image" or package covering is nonfunctional.  This feature, while determinative as to the source of the product, is not essential to its use or purpose nor does it affect its cost or quality.  Hence, plaintiffs have complied with the first prong in this analysis.

(b)  Secondary meaning

There are several factors to prove secondary meaning, including the "length or exclusivity of use of the mark, the size or prominence of [plaintiffs'] enterprise, the existence of substantial advertising the product's established place in the

---

[7]      "A mark is 'descriptive' if it is descriptive of:  the intended purpose, function or use of the goods; of the size of the goods, of the class of users of the goods, of a desirable characteristic of the goods, or of the end effect upon the user."  Wiley v. Am. Greetings Corp., 762 F.2d at 141 n.3 (citing McCarthy, § 11:5, at 353 (footnotes omitted)).

CIVIL 07-1569 (JAG)                    30

market, and [p]roof of intentional copying." <u>I.P. Lund Trading ApS v. Kohler Co.</u>, 163 F.3d at 41.  Plaintiffs proved the intentional copying of their product not only through Dr. Oliva's testimony but also through the defendants' failure to present evidence to the contrary at the evidentiary hearing.  Similarly, the exclusivity of use was shown by the evidence of mark ownership.  Furthermore, there was ample evidence proving the size of the international nature of the enterprise and the expense incurred in substantial advertising.  There was also evidence of how well known the mark is and how long it has been used.

    (c)  <u>Likelihood of confusion</u>

    There are eight factors to determine the likelihood of confusion:  (1) the strength of the plaintiff's mark; (2) the degree of similarity between the two marks; (3) the similarity of the goods; (4) the relationship between the parties' channels of trade; (5) the relationship of the parties' advertising; (6) the classes of prospective purchasers;[8] (7) the evidence of actual confusion; and (8) the defendant's intent in adopting its mark.  <u>Borinquen Biscuit Corp. v. M.V. Trading Corp.</u>, 443 F.3d, 112, 120 (1st Cir. 2006); <u>Veryfine Prods., Inc. v. Colón Bros.</u>, 799 F. Supp. at 251.  There are trademark cases that examine the similarity of

---

    [8]    Factors 3, 4, and 5, are treated together.  This has become a practice in this circuit.  <u>Aktiebolaget Electrolux v. Armatron Int'l, Inc.</u>, 999 F.2d 1, 3 n.3 (1st Cir. 1993) (citing <u>Boston Athletic Ass'n v. Sullivan</u>, 867 F.2d 22, 30 (1st Cir. 1989); <u>Volkswagenwerk Aktiengesellshaft v. Wheeler</u>, 814 F.2d 812, 818 (1st Cir. 1987); <u>Pignons S.A. de Mecanique de Presicion v. Polaroid Corp.</u>, 657 F.2d 482, 488 (1st Cir. 1981)).

CIVIL 07-1569 (JAG)                    31

products in the context of trademark law.  Applying the relevant parts of the eight part test, the court in <u>Polo Fashions, Inc. v. Fernández</u> found that the defendant's use of an almost identical "APOLO" logo, use of a larger type for the work "APOLO," than for the phrase "by Ralph Lauren," similar contrast of label colors, and use of polo player symbol embroidered on defendant's finished product did promote confusion and supported plaintiff's trademark infringement claim.  <u>Polo Fashions, Inc. v. Fernández</u>, 655 F. Supp. 664, 667 (D.P.R. 1987).  Using the same test, the court in <u>Veryfine Prod., Inc. v. Colón Bros.</u> considered all of the similarities between the plaintiff's and defendant's products, and stated that the overall appearance and likeness of the products was so striking that it appeared that the defendant used a colorable imitation of plaintiff's name and mark. <u>Veryfine Prods., Inc. v. Colón Bros.</u>, 799 F. Supp. at 252.  In <u>Veryfine Prods., Inc. v. Colón Bros.</u>, each party's design presented a two-dimensional section of fruit, similar or identical bright pastel coloring against a white background, and similarly configured placement of label markings (name, legal copy, ingredient content, etc.).

Applying the eight factors to the instance case, I must determine on the whole whether there is any genuine issue as to likelihood of confusion.  All factors must be considered although no one factor is necessarily determinative.  <u>Boston</u>

CIVIL 07-1569 (JAG)                    32

Athletic Ass'n v. Sullivan, 867 F.2d at 29 (citing Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d 1201, 1205 (1st Cir. 1983)).

(1) Strength of mark.  There was abundant evidence presented at the hearing reflecting the strength of the mark notwithstanding the proceedings at the USPTO, at the Puerto Rico Trademark Office, DACO, and San Juan Superior Court. Furthermore,  plaintiffs and defendants targeted the same customers and trade channels leading toward a realistic possibility of confusion.

(2) Similarity of the mark.  "[S]imilarity is determined on the basis of the total effect of the designation, rather than a comparison of individual features." Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d at 487 (citing Alpha Indus., Inc. v. Alpha Steel Tube & Shapes, Inc., 616 F.2d 440, 444 (9th Cir. 1980)).  Although the name of the distributors are different, the product which is NOPALINA dietary supplements, is basically the same in appearance.  This creates a likelihood of confusion of the consumer.  Consumers will surely be confused as to the source and will probably believe that the source is the same or perhaps that both distributors are related, for example, that one sponsors the other.

(3) Similarity of the goods.  A mere comparison of plaintiffs' and defendants' products reveals a high degree of similarity between the two.  In fact, the overall appearance of the products is identical right down to the UPC bar code, with a likeness so striking that it appears that defendants' product is a color photocopy

CIVIL 07-1569 (JAG)                    33

of the images used by plaintiffs except for the Made in CHINA label when used. The packagings contain the same art work, colors, sizes, lettering, drawings, and logos.   Thus, "[u]nder this factor, there is a strong likelihood of confusion." Boston Athletic Ass'n v. Sullivan, 867 F.2d at 30 (citing Volkswagenwerk Aktiengesellshaft v. Wheeler, 814 F.2d at 818 (both parties were in the business of automobile sales and service), compare with Astra Pharm. Prods., Inc. v. Beckman Instruments, Inc., 718 F.2d at 1205-06 (plaintiff sold a local anesthetic while defendant sold a blood analyzer) and Pignons S.A. de Mecanique de Precision v. Polaroid Corp., 657 F.2d at 487-88 (plaintiff sold an expensive, high quality camera while defendant sold a relatively inexpensive instant camera)).

Defendants' packaging is simply an imitation of  plaintiffs' packaging as applied to the same goods used in interstate commerce.  Here, testimonial evidence indicates that the product similarity is such that it could not be the product of coincidence.

(4) Relationship Between the Parties' Channel of Trade; (5) Relationship Between the Parties' Advertising; (6) Classes of Prospective Purchasers.  The First Circuit treats these factors simultaneously.  Defendants used the same channels of trade, the same customer base, advertised in the same media, and aimed at similar consumers.  This clearly reflects that defendants adopted plaintiffs' mark withe intent to benefit from plaintiffs' success.

CIVIL 07-1569 (JAG)                    34

(7) <u>Evidence of actual confusion.</u>   The testimonial evidence of actual confusion presented combined with the fact that the pouches sold by the defendant were virtually identical to those of plaintiff, sufficiently show a likelihood of confusion among the customers.

(8) <u>The defendants' intent in adopting its mark.</u>  This factor is clear.  The defendants' behavior and conduct suggest that they wanted to interfere with plaintiffs' customers and market.  The actions of Michael Poma make it apparent that the defendants tried to benefit from plaintiffs' reputation, advertising campaign and distribution network.

All things considered, I find that there is likelihood of confusion between the two products.  Moreover, I find that plaintiffs' trademark infringement claim against defendants would likely result in a decision in favor of plaintiff on the merits of its claim for trademark infringement and dilution of the mark.[9]

Hn                          2.  Unfair Competition

Plaintiffs assert in its First Claim (see Docket No. 1) that defendants' actions constitute unfair trade practices and unfair competition pursuant to Section 43 of the Lanham Act, 15 U.S.C. § 1125.  Under this section, actions must be based on the use of a mark in interstate commerce which is likely to cause confusion or to

---

[9]     Once a court finds that adoption of a similar mark will cause confusion, it logically follows that it is also, in itself, an infringement of the mark. <u>Polo Fashions, Inc. v. Fernández</u>, 655 F. Supp. at 667 (citing <u>Amstar Corp. v. Domino's Pizza, Inc.</u>, 615 F.2d 252, 263 (5th Cir.), <u>cert. denied</u>, 449 U.S. 899 (1980)).

CIVIL 07-1569 (JAG)                    35

deceive purchasers concerning the source of goods.  Quincy Cablesystems, Inc. v. Sully's Bar, Inc., 650 F. Supp. 838, 845 (D. Mass. 1986).

In relation to likelihood of confusion under unfair competition statutes, the same facts supporting a charge of trademark infringement support an unfair competition cause of action.   Veryfine Prods., Inc. v. Colón Bros., 799 F. Supp. at 256.  The third requirement to establish a trade dress infringement (likelihood of confusion) under the Section 43 of the Lanham Act has been discussed. Plaintiffs argue that defendants' acts are the cause of irreparable damage to plaintiffs and that continued sales of counterfeit NOPALINA will cause further irreparable injury unless defendants are enjoined from actively promoting and selling their product.

One endeavoring to break into a market and rival its competitor has a duty to select a mark which is sufficiently distinct to avoid all possible likelihood of confusion.  See Polo Fashions, Inc. v. Fernández, 655 F. Supp. at 667.  That has not happened here; all to the contrary.

Juan Rincón testified that while visiting GNC, he found that GNC  was selling customized NOPALINA Linaza Plus almost identical to the one produced by plaintiffs.   In so doing, along with the above-mentioned facts, his testimony supports plaintiffs' contention of unfair competition.

CIVIL 07-1569 (JAG)                    36

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Court of Appeals for the First Circuit has granted injunctive relief when the elements of trademark infringement and unfair trade practices have been set forth by the plaintiff.  Veryfine Prods., Inc. v. Colón Bros., 799 F. Supp. at 257 (citing Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d 215 (1st Cir. 1989)); see also Boston Athletic Ass'n v. Sullivan, 867 F.2d at 35.  Having considered the evidence presented, I find that plaintiffs are likely to prevail on the merits of their claims for trademark infringement and unfair competition.

B.  Potential for Irreparable Harm if the Injunction is Denied

The second prong in the preliminary injunction analysis requires the court to assess the potential irreparable harm to the movant should the injunction be denied.  An injury will only be considered irreparable if no adequate remedy for the injury exists at law.  See Foxboro Co. v. Arabian Am. Oil Co., 805 F.2d 34, 36 (1st Cir. 1986); see also 11A Charles Alan Wright, et al., Federal Practice and Procedure § 2948.1, at 149-51 (2d ed. 1995).  Monetary damages are generally not considered irreparable injuries.  See DeNovellis v. Shalala, 135 F.3d at 64 ("[A] temporary loss of income which may be recovered later does not usually constitute irreparable injury.").  It is not necessary for plaintiff to establish that denial of injunctive relief would be fatal to its business; it is sufficient for plaintiff to show that injury is not accurately measurable, given that irreparable harm is a natural sequel.  See Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d

CIVIL 07-1569 (JAG)                    37

at 13 (citing, e.g., <u>K-Mart Corp. v. Oriental Plaza, Inc.</u>, 875 F.2d 907, 915 (1st Cir. 1989)).  Evaluating irreparable harm and its likelihood of success on the merits must be considered together.  The greater the likelihood of success on the merits, the less required showing of irreparable harm.  When the likelihood of success on the merits is great, a movant can show somewhat less in the way of irreparable harm and still garner preliminary injunctive relief.  <u>E.E.O.C. v. Astra U.S.A., Inc.</u>, 94 F.3d 738, 743 (1st Cir. 1996).

Plaintiffs have made a requisite showing that without the preliminary injunction they would lose incalculable revenues and sustain harm to their goodwill.  <u>Ross-Simons of Warwick, Inc. v. Baccarat, Inc.</u>, 102 F.3d at 19. Plaintiffs have demonstrated the resultant damage thus far by showing that defendants have sold their counterfeit product to plaintiffs' customers.  The incalculable damage is found in lost revenues, harm to plaintiffs' reputation, and alienation of present and future customers.  "By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages."  <u>Id.</u> at 20 (citing <u>K-Mart Corp. v. Oriental Plaza, Inc.</u>, 875 F.2d at 915).

Defendants have encroached upon plaintiffs' customer base.  A denial of preliminary injunction would effectively give defendant the continued opportunity to use plaintiffs' customer base to sell their version of plaintiffs' product.  In turn, this will likely prevent plaintiff from supplying their product to their own customary

CIVIL 07-1569 (JAG)                    38

customers and would cause substantial damage to the goodwill that Salud Natural and NOPALINA Linaza Plus have created since their inception.  Warwick, Inc. v. Baccarat, Inc., 102 F.3d at 20 (citing Leone v. Town of New Shoreham, 534 A.2d 871, 874 (R.I. 1987)) (holding that inability to serve returning customers constitutes irreparable harm).

### C.  Balance of Relative Impositions

Weighing the hardships of each party is a fact-driven exercise.  The balance of equities favors plaintiffs  because, unless enjoined, the defendants will continue to take unfair advantage of the success of Salud Natural Entrepreneurs.  Under these circumstances, it is clear that the injury suffered by plaintiffs outweighs any harm which the defendants may sustain in being unable to continue marketing their counterfeit NOPALINA.

If injunctive relief is not provided, plaintiffs will have to assume both calculable and incalculable costs (rebuilding NOPALINA's reputation, offsetting the damage caused by unfair competition) while protecting its niche in the market of health food dietary supplements.

### D.  Effect on the Public Interest

The public policy behind the Lanham Act is to prevent the public from encountering confusion, mistake and deception in purchase of spurious goods. Simply stated, consumer confusion is contrary to the public interest.  Traditional

CIVIL 07-1569 (JAG)                    39

trademark and trade dress law, encourages production of products of high quality "and simultaneously discourages those who hope to sell inferior products by capitalizing on a consumer's inability quickly to evaluate the quality of an item offered for sale." I.P. Lund Trading ApS v. Kohler Co., 163 F.3d at 36 (citing Qualitex Co. v. Jacobson Prod. Co., 514 U.S. 159, 164 (1995)). More importantly trademark and trade dress protection serves to protect the trade dress owner and the public by avoiding confusion or mistake. Id. This case presents a tension in free enterprise, between its limitation and promotion. The evidence reflects the defendants' willfully infringing upon plaintiffs' mark with the public interest having suffered as a result.

In summary, clearly "[b]oth registered and unregistered trademarks may be eligible for protection against infringing uses." Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d at 117 (citing 15 U.S.C. §§ 1114, 1125). "When the party seeks protection for an unregistered trademark, it is incumbent [upon] that party to demonstrate affirmatively that its mark is distinctive (either inherently or through secondary meaning)." Borinquen Biscuit Corp. v. M.V. Trading Corp., 443 F.3d at 117 (citing Boston Beer Co. v. Slesar Bros. Brewing Co. 9 F.3d 175, 180 (1st Cir. 1993)); see Attrezzi, LLC v. Maytag Corp., 436 F.3d 32, 37-38 (1st Cir. 2006). The defendants in this case must make a significant showing that the mark is merely descriptive. That has not happened in this case. Indeed, aside

CIVIL 07-1569 (JAG)                    40

from valiant argument after evidence was presented by the plaintiffs, and proffered information contained in the defendants' memorandum in opposition to plaintiffs' motion requesting preliminary injunction filed on July 13, 2007[10] (Docket No. 21), the defense has made no showing that the mark of NOPALINA Linaza Plus is merely descriptive. Thus, notwithstanding my addressing the issue of secondary meaning, plaintiffs are not required to prove secondary meaning.

The word mark of NOPALINA is red in color, accompanied by the green designation Linaza Plus with the NOPALINA little girl design added in a more recent label.  Contrary to the innuendo of the defendants, the conclusion that the NOPALINA girl is Chinese is interesting but not convincing, (see Exhibits 1, 14a), and any portent attaching to the red color of her socks, sneakers or other footwear having to do with Chinese communist politics is even more interesting but less portentous.  The testimonies of health food store owners and managers, as well as that of Dr. Oliva and Mr. Rincón clearly establish that NOPALINA Linaza

---

[10]Defendants also present in this motion a counter motion for preliminary injunction.  In a comprehensive argument, they argue that not only is NOPALINA not a distinctive or valid mark but that NOPALINA Linaza Plus is registered at the Puerto Rico trademark registry.  They argue that the NOPALINA brand was created by a Chinese company, that NOPALINA is not manufactured in the United States, and more importantly, that there is no federal or state trademark registration in favor of plaintiffs of NOPALINA Linaza Plus.  They argue that plaintiffs' own misconduct may bar relief, that they have not proven that the purported mark has acquired fame, and that because of the illegal nature of plaintiffs' mark, the evidentiary burden of establishing the fame of the mark is much higher.  They conclude that plaintiffs are in clear violation of the Puerto Rico Marks Act, P.R. Laws Ann. tit. 10, § 171 et seq.

CIVIL 07-1569 (JAG)                    41

Plus is well known, or famous, in Puerto Rico and it is clear that Salud Natural has a strong interest in protecting its commercial interest in the aforementioned mark. This is clear from the testimony regarding the increase in volume of sales from the year that NOPALINA Linaza Plus began to be marketed in Puerto Rico in 2004 until the present, particularly if compared to the evidence that the defendants' copied packages reflecting "Made in China" with contents emitting a possible chicken feed scent, which were first sold in Puerto Rico, using almost identical packaging, in late 2006.  If one compares both the Chicago product and the China product, the colors, graphics, wording, content, labels and marks are identical.  This type of rote copying can have only one purpose, and that is to confuse the purported counterfeit product with the Salud Natural product.   They are virtually indistinguishable, down to the UPC barcode assigned to Salud Natural.  To stress this intentional wholesale copying any further would be to smooth ice.  It is clear that the defendants wish to cause confusion with their China product to piggyback on plaintiffs' horn of mammon created as a result of the marketing of an attractive, successful product and many thousands of dollars in advertising.  Even believing defendants' version of when they first used the NOPALINA Linaza Plus, it is yet 18 months after plaintiffs first used the same mark.

Defendants give much weight to the fact of registry at the USPTO, and certainly such registry is *prima facie* evidence of ownership of a mark.  However,

CIVIL 07-1569 (JAG)                    42

those proceedings are far from conclusive.   In Puerto Rico, the defendants' arguably fraudulent registration is also under attack.  Finally, it is clear that the registration of the domain name nopalinapr.com incorporating NOPALINA in its entirety, was made with the purpose of making money from the multi-million dollar efforts of Salud Natural.

Again, it is clear from the testimony of the witnesses presented by plaintiffs that there is a likelihood of confusion caused by the trademark as to the source of defendants' product.  Under the Lanham Act, owners of a trademark are clearly protected from the use of such marks.  Plaintffs' first three claims require a showing that there is a likelihood of confusion as to the source of the product caused by the use of the mark.   Because of the strong likelihood of confusion proven at the evidentiary hearing, there is also proof of irreparable harm.  See Keds Corp. v. Renee Int'l Trading Corp., 888 F.2d at 219.  There are simply too many similarities between defendants' product in terms of customer base targeted, actual packaging, marks, advertising channels, intent of copying easily gleaned from comparing packages, and strength of plaintiffs' mark as reflected in its wide dissemination and use for a court to reach a conclusion that the defendants did not wilfully set out to cause confusion between their false product and that of Salud Natural.  Indeed, the defendants have set forth their product as though it were produced by Salud Natural Entrepreneurs.  (See, e.g., Exhibit 31.)

CIVIL 07-1569 (JAG)                    43

A factor to be weighed by the court in determining whether to issue a preliminary injunction is the balancing of the interests of the parties, that is the hardship that will fall upon the defendant if the injunction issues as opposed to the hardship that will fall upon plaintiffs if it does not issue.  Such a balance clearly falls on the side of plaintiffs.  The evidence is overwhelming that the counterfeit product has no rights except those procured by deceit.  For example, Judge Oscar Davila Suliveres reversed his previous order granted an ex parte temporary restraining order which relied on partially misleading information.  The copying of the packaging went down to the finest detail of UPC bar code, and the intials S.N.E. (plaintiffs' initials) in a product showing made in China when none of the ingredients of Salud Natural Entrepreneurs' real products are made in China and there is simply no China connection except for the one created by the counterfeit packaging.  Finally, the public interest is best served in the granting of the motion for preliminary injunction as responding to concepts of truthfulness and consumer trust.  Continuing the wilful confusion caused by the defendants simply damages the consumer's right to trust the genuineness of the natural foods industry and one particular product.

Finally, it is appropriate to emphasize that the defendants presented no evidence.  I repeat, the defendants presented no evidence at the hearing at which plaintiffs presented eight witnesses, at least seven of which provided significant

CIVIL 07-1569 (JAG)                    44

evidence related to different elements of plaintiffs' claims.  That Michael Poma Ramírez decided not to attend the hearing based upon an ethereal proffer of counsel, ultimately may have benefitted him personally but did nothing for his counter motion for preliminary injunction nor for the proffers of the defense memorandum of July 13, 2007.  Commendable as the effort was, the failure to effectively show cause why the preliminary injunction should not issue, proved fatal to the defense.

Thus, I recommend that the court grant the motion for preliminary injunction, deny the counter motion of the defendants, and issue a preliminary injunction as follows:

A.  The defendants, their agents, servants, employees, attorneys, successors, licensees, and assigns, and anyone acting in concert or privity with defendants, jointly and severally, are enjoined:

1. from utilizing the trademarks NOPALINA and/or NOPALINA LINAZA PLUS, or any derivative or shorthand notation thereof, or any term similar thereto, in connection with the sale of health or dietary supplements, which would give rise to a likelihood of confusion as to the source of such dietary supplements as those being sold by plaintiff;

2. from infringing Salud Natural's rights in the NOPALINA marks;

3. from soliciting any business under said NOPALINA marks;

CIVIL 07-1569 (JAG)                45

4.    from passing themselves off as being associated with Salud Natural;

5.    from causing dilution of the distinctiveness of the NOPALINA marks;

6.    from registering in their own name any of the NOPALINA marks;

7.    from using any other trademark, service mark, trade name, corporate name, word or symbol; or doing any other acts likely to induce the belief that defendants' commercial activities, products, services or business are Salud Natural's commercial activities, products, services or business; or that defendants are in any way authorized or sponsored by or connected, endorsed or associated with Salud Natural or with Salud Natural's commercial activities, products, services or business;

8.    from unfairly competing with or against Salud Natural;

9.    from further making public statements consisting of injurious falsehoods meant to denigrate Salud Natural's long-standing right to the NOPALINA marks;

10.   from illegally and tortiously interfering with Salud Natural's relationship with its independent resellers and/or retailers;

The injunction should include a provision directing defendants to file with the court, and serve plaintiffs, within thirty (30) days after the service on defendants of such injunction, a report in writing under oath setting forth in detail the manner and form in which defendants have complied with the injunction.

CIVIL 07-1569 (JAG)                    46

B.   Defendants are enjoined from using in connection with the sale of dietary supplements any labels and/or trade dress which would associate the products sold by defendants as those emanating from Salud Natural and, more particularly, any labels which employ trademarks in red and green on a white background or any artwork or layout confusingly similar to the NOPALINA package, labels, and marks;

C.   The court orders defendants to deliver to the court for impoundment and destruction any and all advertising, brochures, circulars, price lists, signs, banners, business stationery, prints, packages, labels, containers, freights, cartons, receptacles, wrappers, art work, and other materials in its possession or custody or under its control that contain the NOPALINA name or otherwise infringe Salud Natural's NOPALINA marks and any other of Salud Natural's trademarks, service marks or trade names;

D.   The court orders defendants to immediately transfer all rights and ownership unto the internet domain name "nopalinapr.com" and refrain from registering any other internet domain name that infringes upon Salud Natural's NOPALINA marks;

E.   The court orders the cancellation of Puerto Rico Trademark Registration No. 72,071 for NOPALINA LINAZA PLUS *& design*, which mark is currently registered to co-defendant Poma.

CIVIL 07-1569 (JAG)                    47


        Under the provisions of Rule 72(d), Local Rules, District of Puerto Rico, any

party who objects to this report and recommendation must file a written objection

thereto with the Clerk of this Court within ten (10) days of the party's receipt of

this report and recommendation.  The written objections must specifically identify

the portion of the recommendation, or report to which objection is made and the

basis for such objections.   Failure to comply with this rule precludes further

appellate review.   See Thomas v. Arn, 474 U.S. 140, 155 (1985); Davet v.

Maccorone, 973 F.2d 22, 30-31 (1st Cir. 1992); Paterson-Leitch Co. v. Mass. Mun.

Wholesale Elec. Co., 840 F.2d 985 (1st Cir. 1988); Borden v. Sec'y of Health &

Human Servs., 836 F.2d 4, 6 (1st Cir. 1987); Scott v. Schweiker, 702 F.2d 13, 14

(1st Cir. 1983); United States v. Vega, 678 F.2d 376, 378-79 (1st Cir. 1982); Park

Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603 (1st Cir. 1980).

        At San Juan, Puerto Rico, this 18th day of July, 2007.


                                        S/ JUSTO ARENAS
                                Chief United States Magistrate Judge